# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**

* * * * * * * * * * * * * * * * * * *
BEVERLY BLAD,                          *
                                       *       No. 18-391V
            Petitioner,                *
                                       *       Special Master Christian J. Moran
                                       *
v.                                     *
                                       *       Filed: July 15, 2020
SECRETARY OF HEALTH                    *
AND HUMAN SERVICES,                    *
                                       *       Fact ruling; Guillain-Barré
                                       *       syndrome ("GBS"); onset of injury.
            Respondent.                *
* * * * * * * * * * * * * * * * * * *

Andrew D. Downing, Van Cott & Talamante, PLLC, Phoenix, AZ, for petitioner;
Robert P. Coleman, III, United States Dep't of Justice, Washington, DC, for respondent.

## UNPUBLISHED RULING FINDING FACTS[*]

On March 14, 2018, Beverly Blad filed a petition for compensation under the National Childhood Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10—34 (2012), alleging that she suffered from Guillain-Barré syndrome ("GBS") as a result of the influenza vaccine she received on November 11, 2016. Exhibit 1 (Statement of Beverly Blad) ¶ 4. The parties dispute when Ms. Blad started to experience symptoms of GBS. For the reasons explained below, the undersigned finds that a preponderance of the evidence supports onset dates of: (1) arm and injection site pain beginning on November 11, 2016; (2) arm weakness beginning on November 19, 2016; (3) fatigue beginning on November 24, 2016; and (4) leg weakness beginning on February 1, 2017.

---

[*] The E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (Dec. 17, 2002), requires that the Court post this ruling on its website. Anyone will be able to access this ruling via the internet (https://www.uscfc.uscourts.gov/aggregator/sources/7). Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4). Any redactions ordered by the special master will appear in the document posted on the website.

## Procedural History

Ms. Blad alleged that the flu vaccine caused her to develop GBS, citing the presumption of causation afforded in the Vaccine Table. Pet., filed March 14, 2018, ¶ 19. The Secretary has defined GBS as "an acute monophasic peripheral neuropathy that encompasses a spectrum of four clinicopathological subtypes," including the most common subtype, acute inflammatory demyelinating polyneuropathy ("AIDP"). 42 C.F.R. § 100.3(c)(15)(i)-(ii). All subtypes are "typically characterized by symmetric motor flaccid weakness, sensory abnormalities, and/or autonomic dysfunction caused by autoimmune damage to peripheral nerves and nerve roots." § 100.3(c)(15)(ii). The chief symptomatic indication of a GBS diagnosis is "[b]ilateral flaccid limb weakness and decreased or absent deep tendon reflexes in weak limbs."[1] § 100.3(c)(15)(ii)(A).

The Vaccine Table affords a presumption of causation when GBS develops 3-42 days after a flu vaccination. § 100.3(a) ¶ XIV. Ms. Blad alleged that she received the flu vaccine on November 11, 2016. She further alleged that she developed arm pain immediately following her vaccination, arm weakness within 7 days following her vaccination, and leg weakness and fatigue starting around Thanksgiving 2016, approximately two weeks after her vaccination. Pet. ¶ 6; see also Pet'r's Br. at 1 (alleging "onset" within 7-10 days following vaccination without specifying which symptoms). As support for her claim and the onset of her GBS, Ms. Blad filed affidavits and medical records.

The Secretary disputed, among other elements of Ms. Blad's claim, her assertion of onset within the time frame listed in the Vaccine Injury Table for a flu-GBS claim. See Resp't's Rep., filed Feb. 28, 2019, at 8-9. Specifically, the Secretary stated that Ms. Blad's problems walking began occurring long after the applicable time frame of 3-42 days, given that she did not seek medical treatment until February 2, 2017. Id. at 9, citing exhibit 10 at 3.

Ms. Blad then filed an onset affidavit, as well as additional medical records. Ms. Blad indicated in a June 13, 2019 status report that she wished to proceed to a fact hearing to determine the issue of onset. Pet'r's Status Rep., ECF No. 33.

---

[1] Based on the regulatory definition of GBS, whether limb weakness presents as either upper extremity weakness or lower extremity weakness is not clear. 42 C.F.R. § 100.3(c)(15)(ii)(A). The only clear indication from the regulations is that this limb weakness presents as bilateral—in other words, occurring on both sides of the body.

On December 18, 2019, the undersigned ordered the parties to file onset statements in anticipation of the fact hearing. Ms. Blad and the Secretary submitted their onset statements on February 10, 2020, and February 21, 2020, respectively. The hearing was held on March 10, 2020. Ms. Blad testified in person in Washington, DC; Mr. Blad testified remotely via videoconferencing from Phoenix, Arizona; and Mr. Guerrero (Ms. Blad's grandson) and Ms. Pobocek (Ms. Blad's friend) testified remotely via videoconferencing from Buffalo, New York.

## **Standard for Finding Facts**

Petitioners are required to establish their cases by a preponderance of the evidence. 42 U.S.C. § 300aa–13(1)(a). The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." Moberly v. Sec'y of Health & Human Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

The process for finding facts in the Vaccine Program begins with analyzing the medical records, which are required to be filed with the petition. 42 U.S.C. § 300aa–11(c)(2). Medical records that are created contemporaneously with the events they describe are presumed to be accurate. Cucuras v. Sec'y of Health & Human Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Not only are medical records presumed to be accurate, they are also presumed to be complete, in the sense that the medical records present all the patient's medical issues. Completeness is presumed due to a series of propositions. First, when people are ill, they see a medical professional. Second, when ill people see a doctor, they report all their problems to the doctor. Third, having heard about the symptoms, the doctor records what he or she was told.

Appellate authorities have accepted the reasoning supporting a presumption that medical records created contemporaneously with the events being described are accurate and complete. A notable example is Cucuras in which petitioners asserted that their daughter, Nicole, began having seizures within one day of receiving a vaccination, although medical records created around that time suggested that the seizures began at least one week after the vaccination. Cucuras, 993 F.3d at 1527. A judge reviewing the special master's decision stated that "[i]n light of [the parents'] concern for Nicole's treatment . . . it strains reason to

3

conclude that petitioners would fail to accurately report the onset of their daughter's symptoms.  It is equally unlikely that pediatric neurologists, who are trained in taking medical histories concerning the onset of neurologically significant symptoms, would consistently but erroneously report the onset of seizures a week after they in fact occurred."  Cucuras v. Sec'y of Health & Human Servs., 26 Cl. Ct. 537, 543 (1992), aff'd, 993 F.2d 1525 (Fed. Cir. 1993).

Judges of the Court of Federal Claims have followed Cucuras in affirming findings by special masters that the lack of contemporaneously created medical records can contradict a testimonial assertion that symptoms appeared on a certain date.  See, e.g., Doe/70 v. Sec'y of Health & Human Servs., 95 Fed. Cl. 598, 608 (Fed. Cl. 2010) (stating "[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), aff'd sub nom. Rickett v. Sec'y of Health & Human Servs., 468 Fed. Appx. 952 (Fed. Cir. 2011) (non-precedential opinion); Doe/17 v. Sec'y of Health & Human Servs., 84 Fed. Cl. 691, 711 (2008); Ryman v. Sec'y of Health & Human Servs., 65 Fed. Cl. 35, 41-42 (2005); Snyder v. Sec'y of Health & Human Servs., 36 Fed. Cl. 461, 465 (1996) (stating "The special master apparently reasoned that, if Frank suffered such [developmental] losses immediately following the vaccination, it was more likely than not that this traumatic event, or his parents' mention of it, would have been noted by at least one of the medical record professionals who evaluated Frank during his life to date.  Finding Frank's medical history silent on his loss of developmental milestones, the special master questioned petitioner's memory of the events, not her sincerity."), aff'd, 117 F.3d 545, 547-48 (Fed. Cir. 1997).

The presumption that contemporaneously created medical records are accurate and complete is rebuttable, however.  For cases alleging a condition found in the Vaccine Injury Table, special masters may find when a first symptom appeared, despite the lack of a notation in a contemporaneous medical record.  42 U.S.C. § 300aa-13(b)(2).  By extension, special masters may engage in similar fact-finding for cases alleging an off-Table injury.  In such cases, special masters are expected to consider whether medical records are accurate and complete.  To overcome the presumption that written records are accurate, testimony is required to be "consistent, clear, cogent, and compelling."  Blutstein v. Sec'y of Health & Human Servs., No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998).

In determining the accuracy and completeness of medical records, special masters will consider various explanations for inconsistencies between

contemporaneously created medical records and later given testimony. The Court of Federal Claims has identified four such explanations for explaining inconsistencies: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. La Londe v. Sec'y Health & Human Servs., 110 Fed. Cl. 184, 203 (2013), aff'd, 746 F.3d 1334 (Fed. Cir. 2014).

When weighing divergent pieces of evidence, special masters usually find contemporaneously written medical records to be more significant than oral testimony. Cucuras, 993 F.2d at 1528. Testimony offered after the events in question is less reliable than contemporaneous reports when the motivation for accurate explication of symptoms is more immediate. Reusser v. Sec'y of Health & Human Servs., 28 Fed. Cl. 516, 523 (1993). However, compelling oral testimony may be more persuasive than written records. Campbell v. Sec'y of Health & Human Servs., 69 Fed. Cl. 775, 779 (2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); Camery v. Sec'y of Health & Human Servs., 42 Fed. Cl. 381, 391 (1998) (this rule "should not be applied inflexibly, because medical records may be incomplete or inaccurate"); Murphy v. Sec'y of Health & Human Servs., 23 Cl. Ct. 726, 733 (1991) ("[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance.") (citation omitted), aff'd, 968 F.2d 1226 (Fed. Cir. 1992).

One type of a contemporaneously created document is a calendar. A personal calendar may serve as reliable and persuasive evidence when the notations are contemporaneously recorded with an event's occurrence, contain sufficient detail to describe the event, and are not specifically generated in preparation for litigation. See Copeland v. Sec'y of Health & Human Servs., No. 90-867V, 1993 WL 12894, at *3-4 (Fed. Cl. Spec. Mstr. Jan. 7, 1993). In contrast, special masters have found personal calendar entries unpersuasive when they are not recorded with sufficient detail and/or conflict with medical records. See Greene v. Sec'y of Health & Human Servs., No. 11-613V, 2015 WL 9056034, at *11 (Fed. Cl. Spec. Mstr. July 31, 2015); see also Aldridge v. Sec'y of Health & Human Servs., No. 90-2475V, 1992 WL 153770, at *8 (Fed. Cl. Spec. Mstr. June 11, 1992).

## **Summary of Evidence**

Before vaccination, Ms. Blad had a relatively uneventful medical history. She saw an orthopedist, Richard Miller, for shoulder issues starting in 2014, which resulted in a shoulder replacement in early 2016.  See generally exhibit 5.

Ms. Blad's primary care physician was Dr. Maggio with whom she had a long-standing relationship.  At the time of her vaccination, Dr. Maggio had been Ms. Blad's primary care physician for more than three years—and potentially more than 10 years, according to Mr. Blad's testimony.  Tr. 92 (Ms. Blad), 210 (Mr. Blad).  Presumably, based on Ms. Blad's testimony, Dr. Maggio knew about her active lifestyle.  Tr. 93 ("[Dr. Maggio] spent a lot of time with you, talked with you, you know, even about your everyday stuff, which . . . gives them an idea of where you are in your life.").  Though Ms. Blad normally saw Dr. Maggio, she had one appointment with Dr. Maggio's assistant, Mr. Taylor, on September 23, 2016. Exhibit 7 at 57; Tr. 98.

With respect to Ms. Blad's typical response to health issues pre-vaccination, Ms. Blad, Mr. Blad, and Ms. Blad's grandson Mr. Guerrero all commented on Ms. Blad's "stubbornness" or aversion to complaining about her health.  Tr. 13 (Ms. Blad stating that she is "just not a complainer"), 158 (Mr. Guerrero remarking on Ms. Blad's stubbornness), 187 (Mr. Blad stating that "usually when things bother [Ms. Blad], she usually mentions it to me a little bit, but for the most part, she's just one tough cookie.  She just plows on.").  In fact, Ms. Blad provided an anecdote at the hearing regarding a prior injury in which she had broken her back but withstood the injury for approximately three months before seeking medical care after she collapsed on a flight of stairs.  Tr. 13-15.  Despite this typical "stoic" attitude toward health issues, Ms. Blad also characterizes herself as a patient who is assertive with doctors, in that she is comfortable questioning or prodding doctors for clear explanation.  Tr. 118.

Ms. Blad received the flu vaccine on November 11, 2016.  Exhibit 2 at 2. Ms. Blad presented a calendar showing she had various problems in the days and weeks following her vaccination.  See exhibit 21; Tr. 23-28.  Mr. Blad testified that Ms. Blad "treats [her calendar] like a diary," in that she records important life occurrences on a daily basis.  Tr. 220 ("She would write everything down, what was going on that day with her.").  Based on her calendar entries and testimony, she experienced arm redness, swelling, and pain immediately following her vaccination through approximately November 14, 2016.  Exhibit 21 at 2 (noting

"arm red" on November 12, "arm red, swollen" on November 13, and "arm hurts" on November 14); Tr. 23-25.

Ms. Blad, Mr. Blad, and Mr. Guerrero all provided fairly consistent accounts of Ms. Blad's experience and apparent physical symptoms during the holidays following her vaccination. Ms. Blad testified that she had difficulties walking and performing her normal rituals, including cooking a family meal, during her family's Thanksgiving gathering at her house. Tr. 28. She attributed this to newly developing leg weakness and lingering arm weakness. Tr. 28-29. However, when describing her difficulties in detail, her examples seemed to indicate fatigue, rather than severe weakness. She discussed difficulty bending down, getting decorations out, and putting everything up in the house. Tr. 29. Her husband and grandson corroborated this account, particularly with respect to how they made Thanksgiving dinner following her oral instructions, which was very unusual for them to do. Tr. 189 ("It was a combination of me and my grandson doing everything."), 155-56 ("She sat in the kitchen and basically explained to us how to cook the dinner and everything that we needed to do to prepare the food and get everything ready. . . . In the years before, she was the only one allowed in the kitchen."). Mr. Guerrero also mentioned fatigue when describing Ms. Blad's condition during this time, based on his own observations of her. Tr. 156.

She attended her first medical appointment following the vaccination on December 16, 2016. Exhibit 7 at 51-55. According to Ms. Blad, this was intended to be an annual physical; however, her primary care physician was out for the day and she was seen by a physician's assistant, Mr. Taylor. Tr. 32-33. The appointment notes state that this appointment was to serve as a follow-up on a medication change. Exhibit 7 at 51. Each system in the review of systems was noted as "normal." Id. She did not report leg weakness or lethargy at this appointment.

The notes from physician assistant Taylor from the December 16, 2016 appointment do not indicate any complaints about neurologic problems or fatigue. Exhibit 7 at 51-55. In her testimony, Ms. Blad confirms that she did not complain of her condition. Tr. 34-35. Ms. Blad attempted to explain this omission by presenting testimony from herself and Mr. Blad. They testified that she did not complain of her weakness and lethargy because of her discomfort with Mr. Taylor. Ms. Blad stated that she was "put off by him" because he had mixed up her medical chart with that of her brother-in-law (who visited the same doctor's office) and because "he was new at the office, I had never seen him before. He didn't know me and he was disgusting. He had really horrible bad teeth. He had a beard

7

that looked like it hadn't been washed or combed.  And I just wanted to get out of there."  Tr. 34.  Mr. Blad corroborated this based on her recounting this occurrence to him after the appointment.  Tr. 225-26 ("[S]he thought this guy was creepy, this guy – she didn't want him touching her.  He had the wrong records . . . with him.").

Next, when describing her condition during Christmas, Ms. Blad stated that she did not prepare her normal Christmas meal or decorate because she was too weak.  Tr. 37.  Mr. Guerrero confirmed this account, stating that this behavior was very unusual for her.  Tr. 158.  Mr. Blad characterized her as undergoing a steady decline in her condition starting around Thanksgiving and moving into Christmas.  Tr. 190.  All three witnesses also provided fairly consistent accounts of Ms. Blad having to use a cane to walk shortly after Thanksgiving, though the timing of this differed slightly among their accounts.  Tr. 32, 155, 190-91.

Ms. Blad next saw her primary care physician, Dr. Maggio, on January 5, 2017, for a complete physical examination.  Exhibit 7 at 45-50; Tr. 42-43.  The notes indicate that, during this appointment, Dr. Maggio spent approximately 45 minutes on "face-to-face instruction and education."  Id. at 48.  Dr. Maggio also recorded no numbness, id. at 45, and normal motor strength, and an impression that "[o]verall Beverly is stable with numerous co-morbidities," id. at 47.  Ms. Blad also claimed that the notes from her January 5, 2017 visit were filled with errors, making his lack of notation regarding her leg weakness complaint irrelevant because he was not taking accurate notes.  Tr. 55-57.

There is some inconsistency between the affidavits and hearing testimony regarding whether Ms. Blad actually reported her leg weakness to Dr. Maggio at this appointment, making her account of this visit at the hearing less persuasive or credible.  In Ms. Blad's first affidavit, she averred that "[o]n January 5, 2017, [she] returned to the doctor for [her] annual physical, and again made no mention of the leg pain [she] was experiencing."  Exhibit 1 ¶ 8.  In his first affidavit, Mr. Blad corroborated this initial account by stating that "[w]hen [Ms. Blad] came out from the appointment, [he] asked her if she had discussed her complaints with Dr. Maggio, and she indicated that she did not because she knew what he would say."  Exhibit 11 ¶ 8.  However, in their hearing testimony, both Ms. Blad and Mr. Blad contradicted these statements made in their affidavits.  See Tr. 43, 192.  Ms. Blad testified that she mentioned her leg weakness during her January 5, 2017 appointment with Dr. Maggio, but that he brushed it off as a symptom of old age and that she did not challenge him or report to him further.  Tr. 43.  Specifically, Ms. Blad claimed that she complained of leg weakness and that Dr. Maggio

8

responded that "it was age-related . . . and that was the end of it." Tr. 43.  Mr. Blad testified that he had accompanied her to this appointment and that, after it was over, she told him that Dr. Maggio had "chalked [her issues] up to her age."  Tr. 192.  He further stated that, for Ms. Blad, "that was ingrained and that's how she was going to take it and that's how she was going to tow the line."  Id.  To further explain what they believed was the cause of Dr. Maggio's dismissiveness, Ms. Blad and Mr. Blad both remarked on Dr. Maggio's decline as a practitioner from prior years, claiming that after moving to a larger practice, he became less attentive to his patients.  Tr. 93, 209-10.

There is no evidence that Ms. Blad attempted to obtain medical care for the weakness and lethargy she alleges she was experiencing in December 2016 or January 2017.  In fact, the strongest indicator of the onset of Ms. Blad's leg weakness occurring outside the 3-42 day period following vaccination is Ms. Blad's lack of medical records reflecting this weakness or pursuit of medical care until her emergency room visit on February 2, 2017.  See exhibit 10 at 3 (reporting "1-day history of back tightness and profound lower extremity weakness").

At this emergency room visit, occurring roughly one month after her appointment with Dr. Maggio, Ms. Blad reported "[bilateral lower extremity] weakness starting on Wednesday and progressing where she is unable to feel her bladder urge."  Exhibit 10 at 8.  Her attending physician further documented that Ms. Blad was "[u]nable to walk with sudden-onset lower extremity weakness . . . [and] [u]nable to feel her bladder when she voids."  Id. at 3.  Ms. Blad confirmed through her hearing testimony that she did not report that her lower extremity weakness had begun in November because the attending physician did not ask if she had prior weakness and appeared to be triaging her care.  Tr. 51.  Regardless, there are still no medical records between her vaccination on November 11, 2016, and her emergency room visit on February 2, 2017, that indicate her alleged evolving condition during this time.  Furthermore, she saw a physician's assistant and her primary care doctor during this period—in mid-December and early January—and neither visit was for the purpose of or incidentally included reports of her alleged symptoms.

### Findings for Onset of Symptoms

The physical conditions Ms. Blad asserts that she experienced during the relevant time period can be categorized into four types: (A) arm and injection site pain which started immediately after vaccination and resolved a few days later; (B) arm weakness, which Ms. Blad first notes in her calendar as occurring on

9

November 19 and is described as "lingering" at Thanksgiving; (C) fatigue, which is primarily described as occurring around the holidays; and (D) leg weakness, which is referenced in testimony describing Ms. Blad's difficulty walking around her house during the holidays, but more heavily emphasized in late January when the sharp downturn in her physical health began.

    A.    Arm and Injection Site Pain

Based on the evidence presented, the undersigned first finds that Ms. Blad experienced arm and injection site pain and swelling immediately following her vaccination on November 11, 2016, and lasting through approximately November 14, 2016. This is based primarily on Ms. Blad's calendar notations made on November 12-14, as well as corroborating testimony from her and her husband. On November 12, Ms. Blad noted "arm red"; on November 13, Ms. Blad noted "arm red, swollen, call Maggio?"; and on November 14, Ms. Blad noted "arm hurts." Exhibit 21 at 2. The November 14 entry was the last notation involving arm pain. Ms. Blad confirmed that she experienced arm pain and swelling in the days immediately following her vaccination, Tr. 22-23, and Mr. Blad testified that Ms. Blad complained of a "throbbing" and "aching" pain the day of her vaccination but that she pushed through this initial pain due to her "stoic" response to discomfort, Tr. 186-87.

The consistency between Ms. Blad's calendar entries with respect to this initial arm pain and the testimony supports the finding that Ms. Blad experienced arm pain starting immediately after vaccination and lasting through approximately November 14, 2016. Ms. Blad's calendar entries appear to be recorded contemporaneously given the descriptions of her calendar as akin to her "diary," which supports the finding that they were not prepared in anticipation of litigation. This makes them reliable in a general sense. Furthermore, they are detailed in that they describe physical symptoms on certain days. See Mueller v. Sec'y of Health & Human Servs., No. 06-775V, 2011 WL 1467938, at *9 (Fed. Cl. Spec. Mstr. Mar. 16, 2011) (finding calendar entries unpersuasive where they did not describe specific symptoms, but were merely used to the refresh the petitioner's recollection of her symptoms on particular days). Additionally, the calendar entries are consistent with her and her husband's testimony, bolstering their persuasiveness regarding this particular symptom. Furthermore, while the lack of pursuit of medical treatment is relevant for the other, more severe symptoms discussed below, the undersigned finds it reasonable that Ms. Blad would not have necessarily sought medical care for initial injection site and arm pain that was relatively mild and only lasted for a few days post-vaccination.

B.  Arm Weakness

The undersigned finds that Ms. Blad's arm weakness began on November 19, 2016, and lasted for approximately one week.  Similar to the evidence regarding her initial arm pain, consistent calendar entries and testimony support the findings regarding arm weakness.  The first indication of arm weakness—as opposed to arm pain related to an injection site reaction—is a calendar entry on November 19, 2016, which reads "weakness in arms."  Exhibit 21 at 2.  Ms. Blad also testified that this arm weakness resolved "within a week or so."  Tr. 68-69.  She further testified that she experienced lingering arm weakness during Thanksgiving, which is consistent with this week-long time frame.  Tr. 29.

The consistency between the calendar entries and Ms. Blad's testimony support the finding that her arm weakness began on November 19, 2016, and lasted approximately one week.  As with the evidence regarding her arm pain, it is also reasonable to conclude that the combination of Ms. Blad's "stoic" response to health issues and the fact that her arm weakness was relatively short-lived would keep her from seeking medical treatment for this symptom.

C.  Fatigue

The undersigned finds that Ms. Blad's fatigue began on approximately November 24, 2016, around Thanksgiving.  This is based on the consistent testimony provided by Mr. Blad and Mr. Guerrero regarding Ms. Blad's behavior during the holidays, beginning with the family's Thanksgiving gathering.  Though Ms. Blad asserts that this was also around the time she began experiencing leg weakness, the observations detailed in the testimony indicate fatigue and not necessarily leg weakness.  The consistency in testimonies regarding Ms. Blad's inability to perform her normal holiday activities makes the assertion that she was experiencing fatigue persuasive.  See Tr. 29 (Ms. Blad), 187-89 (Mr. Blad), 155-56 (Mr. Guerrero).  The fact that these accounts revolve around Thanksgiving and Christmas, clear time markers, makes it likely that the witnesses' recollections regarding timing are roughly correct.  Much of Mr. Blad's and Mr. Guerrero's testimony focus on their subjective observations of Ms. Blad's fatigue and lethargy, as opposed to pain or weakness.  Thus, it is likely that Ms. Blad's fatigue began around November 26, 2016, and continued through the holidays.

11

D. Leg Weakness

Finally, the undersigned finds that Ms. Blad's leg weakness began on approximately February 1, 2017.  This is based on her report to emergency room staff when she was admitted on February 2, 2017, as well as the lack of pursuit of medical treatment and failure to report any symptoms at intervening doctor's appointments in the three months between her vaccination and emergency room visit.  There are no medical records that indicate a complaint of leg weakness between November 11, 2016, and February 2, 2017.  Ms. Blad attempted to compensate for this lack of evidence by providing her calendar entries and testimony from her husband and grandson regarding her mobility issues, which they claim began around the holidays and progressed until her clear adverse turn in health in the day or so before her emergency room visit.  However, this evidence is outweighed by the dearth of medical records, especially given Ms. Blad's two medical appointments that fell within the time frame when Ms. Blad claims her leg weakness was progressively worsening.  The undersigned does not doubt, based on the testimony of Mr. Blad and Mr. Guerrero, that Ms. Blad would be likely to downplay symptoms due to her "stoic" approach to health issues.  Tr. 187.  However, this stoicism does not account for her lack of reporting or emphasis on these symptoms at medical appointments for a condition that she claimed was severe and debilitating.  It also does not account for her affirmative statement indicating "sudden-onset" lower extremity weakness upon her admission to the emergency room.  Exhibit 10 at 3.

First, to address her lack of reporting at her December 16, 2016 appointment with Mr. Taylor, Ms. Blad stated that she was uncomfortable with him.  Much of Ms. Blad's claim that she was uncomfortable with Mr. Taylor, and thus did not report her condition to him, seems to hinge on her lack of familiarity with him, as well as her shock at his appearance and conduct.   However, Ms. Blad had an appointment with Mr. Taylor approximately three months prior on September 23, 2016.  Exhibit 7 at 57.  She confirmed this fact at the hearing but insisted that she "didn't like him." Tr. 98.  She then continued to comment on various aspects of his physical presentation and conduct that seemed to describe the December 16, 2016 appointment, rather than the September 23, 2016 appointment. Tr. 99.  In light of the facts that (1) Ms. Blad had seen Mr. Taylor on September 23 without any clear negative experience at the appointment, and (2) Ms. Blad claimed her symptoms around this time were uncomfortable and debilitating enough for her to be "glad that [she] was going to see Maggio because [she] had put it off," it is unlikely that her encounter with Mr. Taylor was enough to make her leave her annual physical without any mention of her condition.  At a minimum, the

12

inconsistency in her testimony regarding her never having seen or met Mr. Taylor prior to December 16, 2016, shows some memory deficiency with respect to these appointments.

Furthermore, if the claimed reason for Ms. Blad's lack of reporting to Mr. Taylor was based on her lack of comfort and familiarity with him, this makes her explanation for her lack of reporting to Dr. Maggio in January even less persuasive. It appears likely that Ms. Blad did not report her leg weakness to Dr. Maggio, given that there are no indications of this complaint in his notes from the appointment. This alone supports a finding that Ms. Blad was not experiencing leg weakness at this time. However, even if she did report to Dr. Maggio, it is unlikely, based on Ms. Blad's extensive familiarity with Dr. Maggio, the alleged severity of her leg weakness at the time, and her self-proclaimed assertiveness with medical providers, see Tr. 118 ("I question doctors . . . if they say something, I go, well, explain that or I want to know all about it . . . ."), that she would have let Dr. Maggio's alleged "brush-off" occur without some explanation or push-back. It is also unlikely that someone as familiar with Ms. Blad's active lifestyle as Dr. Maggio—a provider who had been treating her for potentially more than 10 years—would question her complaints of severe leg weakness.

If Ms. Blad were truly unsatisfied with Dr. Maggio's treatment or response to her complaints, it is unclear why she did not seek care from another physician. See Tr. 124 ("Q: Did you consider going to a different doctor if Dr. Maggio's office was cold to you? A: Yes, I did. But it never happened. . . . I thought, well, you know, I could always go to urgent care or I could go to the emergency room. So I didn't."). It is also unclear why she did not consult her orthopedist, with whom she had already established care, who presumably would have specialist-level knowledge on muscle weakness, and with whom she testified it was easy to get an appointment. Tr. 94-95. Thus, the lack of medical record evidence regarding Ms. Blad's claimed leg weakness during the relevant time, as well as her lack of clear pursuit of medical care for what she claims was a debilitating condition, cut strongly against a finding of leg weakness beginning before the February 1, 2017 events that were the impetus for her emergency room visit.

Some characteristics of an emergency room might render the information provided less exhaustive, such as the need to triage and to gather medical information relatively quickly. However, the fact that Ms. Blad did not mention the allegedly prolonged nature of her lower extremity weakness further lessens the likelihood that this symptom began before the events leading up to the emergency room visit. The medical personnel who attended to Ms. Blad in the emergency

13

room recorded her symptoms as "sudden-onset" beginning in the days immediately preceding her emergency room visit. This medical record evidence only further supports the finding that Ms. Blad did not experience lower extremity weakness before February 1, 2017.

Finally, to address Ms. Blad's calendar entry evidence specifically with respect to her leg weakness, special masters have found medical record evidence more persuasive when notations in the medical record directly conflict with notations in a calendar or diary. See, e.g., Greene, 2015 WL 9056034, at *8. Ms. Blad has three calendar entries that could pertain to leg weakness (in other words they are the only entries that do not pertain specifically to arm pain or arm weakness) on December 5, 2016, exhibit 21 at 3 ("woke up, very weak"), and December 24-25, 2016, id. ("no dinner, too weak" on each day). While there is no affirmative notation in Ms. Blad's medical records that conflicts with these calendar entries, the lack of reporting to her medical providers and resultant lack of recorded complaints are in conflict with the assertedly severe symptoms documented in her calendars during the time that these medical appointments took place. Thus, the calendar entry evidence, while helpful and reliable to the extent that they bolstered Ms. Blad's recollection of events, are not persuasive enough to override the complete lack of medical record evidence regarding any leg weakness Ms. Blad claimed she experienced prior to February 2, 2017.

## Conclusion

For the reasons explained above, the undersigned finds that Ms. Blad experienced: (1) arm and injection site pain beginning immediately after vaccination on November 11, 2016, and continuing through November 14, 2016; (2) arm weakness beginning on November 19, 2016, and continuing for approximately one week; (3) fatigue beginning on November 24, 2016; and (4) leg weakness beginning on February 1, 2017.

The parties are ordered to provide this ruling to any expert they retain. If the expert's opinion is not consistent with these findings of fact, the opinion is likely to not be persuasive. See Burns v. Sec'y of Health & Human Servs., 3 F.3d 415, 417 (1993) (holding that the special master did not abuse his discretion in refraining from conducting a hearing when the petitioner's expert "based his opinion on facts not substantiated by the record").

A status conference is set for **Tuesday, August 25, 2020, at 2:00 P.M. Eastern Time**. Ms. Blad should be prepared to propose the next step in this case.

**IT IS SO ORDERED.**

<u>s/Christian J. Moran</u>
Christian J. Moran
Special Master
